# Recording Agreement

This Agreement, made and entered into this 26th day of December, 1997, by and between **MONIQUE MARVEZ** (hereinafter referred to as ARTIST) and **UPROAR ENTERTAINMENT**, (hereinafter referred to as UPROAR).

1.      The parties hereto desire and intend by this Agreement to provide for the recording of one completed Master Sound Recording for the purpose of marketing, manufacturing and sales of certain products, i.e. CD's, cassettes, therefrom.  Master Sound Recording is:  UNTITLED.

2.      Master Sound Recording for the purpose of this Agreement means complete original audio tape recording or duplicate master tapes of a sound recording.  It is understood that this Agreement is for the exclusive rights to reproduce, distribute the Master Sound Recordings throughout the world in any sound recording form now known or unknown, including but not limited to tapes, and CD's.  The sound recording is to be a minimum of 40 minutes and a maximum of 55 minutes in length and will be comedy only - no music and will be marketed only as a comedy album.

3.      Artist warrants in connection with this Agreement that it has the entire right and authority to record the album and that neither the album, nor the performance embodied thereon violate or infringe upon the right of any person or firm to the best of Artist's knowledge.

4.      (a)  Artist agrees to accept and Uproar agrees to pay as payment for the rights herein contained, an advance against royalties in the sum of $1,000. payable on the night of recording and a sliding royalty scale for U.S. and Canada as follows:  12% of the suggested retail price of $13.98 CD/$8.98 cassette up to 25,000 units sold; 14% from 25,001 to 50,000 units sold; 16% over 50,000 units sold and 20% over 100,000 units sold.  Should Uproar's suggested retail price on CD's and/or cassettes increase, then Artist's royalty will increase proportionately with the suggested price change.  Said royalty is based on 100% of the manufacturer's suggested retail price less the packaging deduction, for each Disc, Tape or any other device now known or unknown, made and sold, distributed and manufactured by Uproar for which payment is actually received or credited to the account of Uproar.  It is agreed that Uproar shall be allowed a 10% free goods deduction against units sold.  The packaging deduction as to all configurations shall be no more than fifteen percent (15%).  Uproar further agrees that there shall be no royalties due and payable on "promotional" units distributed. There are no mechanical royalties due and payable.

        (b)  All one time charges actually incurred and paid for by Uproar, including but not limited to, the actual direct out of pocket costs of all packaging graphics such as original artwork, color separations, negatives and composed films, recording and related mastering charges for CD's and cassettes shall be recouped against royalties earned under the terms of this agreement.  However, in no event shall the total of said charges exceed the sum of $10,000.00 unless the recording takes place outside of Southern California.  In that event, all

one time charges incurred in excess of $10,000.00 shall also be recouped.

(c) For any rights licensed by Uproar to third parties including but not limited to, mail order distribution, record club distribution, sales and manufacture outside the United States and Canada for which Uproar receives a royalty, flat fee or other compensation, then the royalty payable shall be 50% of 4(a) but not less than 50% of the gross proceeds received by Uproar or credited to Uproar and shall be computed on the same basis as monies received by Uproar.

(d) For all sales to third parties including but not limited to, mail order distribution, record club distribution, sales outside the United States and Canada, the royalties payable pursuant to this Agreement shall be at 50% of the gross but not less than 50% of the royalty referred to in sub-paragraph 4(a).

5.      Uproar and Artist agree that Uproar shall hold in reserve against returns 30% of all monies received from sale of product. Any returns in excess of the 30% reserve shall be deducted from royalties earned during the then current accounting period. However, should there be insufficient funds available during that period, said returns shall be deducted from the next due and available record royalties. Once monies held in reserve become six (6) months old, they shall be released to Artist over the two (2) following quarterly periods. Uproar further agrees to render to Artist quarterly Royalty Statements and during the term of this Agreement said Statements shall be delivered by Uproar to Artist no later than sixty (60) days following the last day of each quarterly period ending MARCH/JUNE/SEPTEMBER/DECEMBER of each year for five years and thereafter if any account activity including but not limited to sales, returns, payments due or reserves liquidated, accompanied by a Statement setting forth in detail the computation of the amount thereof. Artist may appoint a CPA or attorney to examine Uproar's books and records as the same pertain to this Agreement, provided that such examination shall take place at Uproar's L. A. offices during normal business hours, on at least thirty days notice, and at Artist's sole cost and expense and no more than once yearly.

6.      Artist grants to Uproar the right to use the name, approved likeness and approved biography of the featured Artist whose performance is embodied in said Sound Recording in connection solely with the advertising and sale of the Sound Recording.

(a) Artist must give Uproar requested changes and/or comments within 30 days of receiving edited cassette from Uproar. Further, Artist must give written final approval of finished master within 30 days of receipt of same or said master will be deemed approved for content by Uproar.

7.      Artist and Uproar agree that within the time frame of this Agreement Uproar will have the option to negotiate in good faith for a second recording by Artist. Artist agrees not to re-record any of the material controlled on any masters hereunder on any audio project unless that particular master is no longer being commercially distributed by Uproar or five years from the date hereof, whichever is shorter. Artist may re-record said material for television, movies, or video.

8.    Uproar agrees to use their very best efforts to promote and market this sound recording currently untitled.  These costs are not recoupable by Uproar.

9.    Artist and Uproar agree to mutually defend, indemnify and hold harmless against any and all liability, loss, damage, cost or expense, including reasonable outside attorney's fees, paid or incurred by reason of any breach of any covenants, warranties or representations hereunder reduced to final judgment or settled with consent of both parties.  Additionally, Uproar agrees to indemnify and hold Artist harmless from any claim arising from Uproar's development, production, distribution and other exploitation of the Album to the extent the same is not covered by Artist's indemnities hereunder.

10.    Uproar shall provide Artist with fifty (50) free copies of the album (no royalties due) and will sell unlimited additional copies to Artist at $8.00 each with no additional royalties due.

11.    Artist retains 100% ownership of the material performed on said Master Sound Recording, however no ownership of the Master Sound Recording itself.

THE PARTIES HAVE EXECUTED THIS AGREEMENT THIS DAY AND YEAR FIRST WRITTEN.

**ARTIST**                                    **UPROAR ENTERTAINMENT**

BY:_Monique Marvez_                BY:_____
**MONIQUE MARVEZ**                    **DAVID DROZEN**

**SS#:**_____

**ADDRESS:**_____

_____