R. Anthony Young (SBN 202473)
tyoung@cylgpc.com
**CYLG, P.C.**
1901 Avenue of the Stars, Suite 200
Los Angeles, California 90067
Telephone: 310.620.2274
Facsimile: 888.620.7886

Attorneys for Defendant
UPROAR ENTERTAINMENT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MONIQUE MARVEZ, an individual,

Plaintiff,

v.

UPROAR ENTERTAINMENT, a California Corporation and DOES 1-20 INCLUSIVE,

Defendants.

Case No. 2:22-cv-02866-SVW (MRW)

**DEFENDANT UPROAR ENTERTAINMENT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: December 19, 2022
Time: 1:30 p.m.
Location: Courtroom 10A
350 W. 1st Street, 10th Fl.
Los Angeles, CA 90012
Judge: Honorable Stephen V. Wilson

Trial Date: None
Complaint Served: July 26, 2022

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

NOTICE IS HEREBY GIVEN that on December 19, 2022, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 10A of the above-entitled Court, located at 350 W. 1st Street, 10th Floor, Los Angeles, California 90012, Defendant Uproar Entertainment (Uproar") will and hereby does move the Court to dismiss, without leave to amend, Plaintiff Monique Marvez's ("Plaintiff") First Claim for Relief in the First Amended Complaint ("FAC") for copyright infringement, the Second Claim for Relief for breach of contract, and the Third Claim for Relief for an accounting, pursuant to Federal Rule of Civil Procedure 12(b)(6) and L.R. 7-3 and 7-5, on the grounds that Plaintiff fails to state a claim upon which relief can be granted.

Uproar requests that the Court grant this Motion, with prejudice, with respect to Plaintiff's copyright infringement claim because Plaintiff does not have a registered copyright in the underlying comedy routines, which is a prerequisite to filing a copyright infringement claim. Second, even if Plaintiff properly alleged and registered a copyright interest in the underlying comedy routines, the parties' contract granted Uproar a license to use the routines as embodied in the sound recordings. Uproar also requests dismissal of Plaintiff's second claim because it is dependent upon Plaintiff's flawed theory of infringement and Uproar has a license to use the underlying comedy routines, therefore there is no breach of contract. Finally, Uproar requests dismissal of Plaintiffs accounting claim because it is also based on the failed copyright infringement claim, and the parties' contract provides a mechanism whereby Plaintiff may appoint a CPA or attorney to examine Uproar's books and records, making a court-ordered accounting unnecessary and inappropriate.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on November 7, 2022. However, the Parties were unable to reach a resolution thereby necessitating this Motion.

Defendant's Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, and upon such further argument and evidence presented at or before the hearing of this matter.

Respectfully submitted, this the 10th day of November, 2022.

**CYLG, P.C.**

*/s/ R. Anthony Young**
R. Anthony Young

Attorneys for Defendant
UPROAR ENTERTAINMENT

## INTRODUCTION

Plaintiff, a comedian, entered into an agreement with Uproar to record a series of albums of her comedy performances. Plaintiff claims that, although Uproar was given ownership of the sound recordings, she retained ownership of a separate copyright to the underlying comedy routines. Plaintiff then asserts that Uproar violated her copyright in the underlying routines by licensing the sound recordings to third parties. Plaintiff then claims that (a) Uproar's copyright violation also violated the parties' agreement and (b) she is entitled to an accounting of the royalties owed under the agreement for Uproar's unauthorized distribution of the comedy routines.

Plaintiff's lawsuit is baseless on its face. First, as a threshold matter, Plaintiff does not have a registered copyright in the underlying comedy routines and, therefore, cannot file suit. Second, even if Plaintiff has properly alleged and registered a copyright interest in the underlying comedy routines, the parties' agreement unmistakably granted Uproar a license to use the routines as embodied in the sound recordings. Finally, because Uproar did not violate any copyrights, Uproar did not breach the parties' agreement and Plaintiff has no grounds for an accounting.

## FACTUAL ALLEGATIONS

For purposes of its Motion, Uproar takes the factual allegations in Plaintiff's Complaint as true unless refuted by the material provided in the FAC itself.

Plaintiff is a comedian and the author of various original comedy performances. Dkt. 13, FAC ¶ 10. Uproar is a comedy entertainment company. *Id.* ¶ 11. On December 26, 1997, Plaintiff entered into a recording agreement with Uproar to record Plaintiff's comedy performances as Master Sound Recordings (the "Recording Agreement"). *See id.*, Ex. B.

The Recording Agreement gave Uproar the exclusive rights to reproduce and distribute the Master Sound Recordings. *Id.* ¶ 11. Specifically, the Recording Agreement states:

> It is understood that this Agreement is for the exclusive rights to reproduce, distribute the Master Sound Recordings throughout the world in any sound recording form now known or unknown, including but not limited to tapes, and CD's.

*Id.*, Ex. B, ¶ 2. Moreover, the Recording Agreement expressly contemplates that these exclusive rights include the right to license the Master Sound Recordings to third parties. *Id.*, Ex. B, ¶ 4(c) ("For any rights *licensed by Uproar* . . . ." (emphasis added)). Regarding ownership of the recordings, the Recording Agreement states that "Artist retains 100% ownership of the material performed on said Master Sound Recording, *however no ownership of the Master Sound Recording itself*." *Id.*, Ex. B, ¶ 11 (emphasis added). Finally, while Plaintiff retained ownership of the comedy routines, she agreed not to record the material on any other audio project for at least 5 years. *Id.*, Ex. B, ¶ 7.

Pursuant to the terms of the Recording Agreement, Uproar and Plaintiff recorded the album "Built for Comfort," for which Plaintiff received a $1,000 advance of royalties. *See id.*, Ex. B. In June 2003, Uproar and Plaintiff agreed in an addendum to the Recording Agreement (the "Addendum") to record a second album, "The Reality Chick," pursuant to substantially the same terms, though Plaintiff elected to receive her advance in the form of 100 CDs (a $1,200 approximate value). *Id.*, Ex. C.[1]

On March 6, 2000, Uproar entered into a license agreement (hereinafter "License Agreement") with Comedy World Inc. *Id.* ¶ 14; *see id.*, Ex. C. Uproar's License Agreement with Comedy World Inc. covered certain "Materials," including the album

[1] The Addendum to the Recording Agreement is included as the last page within Exhibit C; Exhibit C is otherwise the Licensing Agreement between Uproar and Comedy World, Inc.

"Built for Comfort." *Id.*, Ex. C, ¶ 2 & Schedule A. Plaintiff asserts that she did not consent to the licensing of her underlying comedy routines by Uproar to any third party, including Comedy World Inc. *Id.* ¶ 16.

Plaintiff also alleges, upon belief, that Uproar submitted the Musical Sound Recordings to YouTube and other unnamed entities so that the Recordings would be streamed on one or more channels. *See id.* ¶¶ 17–18. Plaintiff asserts that she did not consent to Uproar submitting her underlying comedy routines to YouTube. *Id.* ¶ 19.

Plaintiff claims that, in addition to the unauthorized distribution of her underlying comedy routines, she has not received royalties for the unauthorized licensing of these routines. *Id.* ¶¶ 20–21.

## ARGUMENT

Plaintiff's complaint centers on her claim that the Recording Agreement with Uproar only permitted Uproar to license and distribute the Master Sound Recordings but not her purported copyright to the underlying comedy routines embedded in those recordings. Based on the copyright infringement claim, Plaintiff also asserts derivative claims for breach of contract and an accounting. Because Plaintiff's copyright infringement claim is defunct, Uproar asks the Court to dismiss the copyright claim and the two derivative claims.

## I. STANDARD OF REVIEW

To survive a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "detailed factual allegations" are not required, "an unadorned, the-defendant-unlawfully-harmed-me accusation"; "labels and

conclusions"; "naked assertion[s] devoid of further factual enhancement"; and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" do not suffice. *Id.*

Dismissal under Rule 12(b)(6) is appropriate whenever "the complaint lacks . . . sufficient facts to support a cognizable legal theory." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (internal quotation marks omitted). In ruling on the dismissal motion, the court may consider exhibits attached to or incorporated by reference in the complaint. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

## II. PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NO REGISTERED COPYRIGHT INTEREST IN THE SUBJECT COMEDY ROUTINES

While the FAC makes a conclusory allegation that Plaintiff is the author of certain "compositions" that are original works of authorship and registered with the United States Copyright Office, the Complaint provides no support for this allegation. Plaintiff's copyright registrations, which are the basis of this entire action and prerequisite to filing any copyright infringement claim, do not claim a copyright interest in any underlying comedy routines.

### A. Plaintiff Does Not Have A Registered Copyright In The Comedy Routines.

Plaintiff's copyright registrations themselves assert a copyright interest in *sound recordings* and not in the subject comedy routines (or indeed any "compositions") as claimed in the FAC. Plaintiff, therefore, cannot bring a claim based on infringement of her copyright to the underlying comedy routines.

Section 411 of the Copyright Act provides that "no civil action for infringement . . . shall be instituted until registration of the copyright claim has been made" with the

Copyright Office. 17 U.S.C. § 411(a). "Before pursuing an infringement claim in court . . . , a copyright claimant generally must comply with [Section] 411(a)'s requirement that 'registration of the copyright claim has been made.' Therefore, although an owner's rights exist apart from registration, registration is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, __ U.S. __, 139 S. Ct. 881, 887 (2019) (citations omitted).

Plaintiff has never registered her copyright claim in the underlying routines. Plaintiff's copyright registrations only claim authorship and ownership of the "sound recordings." Notably, Exhibit A to the FAC is for Registration Number SR 913-256, with the "SR" referring to a sound recording. Dkt. 13, FAC, Ex. A. In addition, the registrations state that the author created "*Sound recording*(s): All Tracks Being Registered," and makes no other claims of ownership *Id.* (emphasis added).

Sound recordings are a fundamentally different copyright interest than spoken word literary works or musical work "compositions." 17 U.S.C. § 102(a). As the Fifth Circuit explained:

> The distinction may be summed up as the difference between a copyright in a Cole Porter song and a copyright in Frank Sinatra's performance of that song. The former would be a musical work copyright and the latter would be a sound recording copyright, although both *may be embodied in the same phonorecord*.

*Daboub v. Gibbons*, 42 F.3d 285, 288 (5th Cir. 1995) (emphasis added) (quoting 1 M. Nimmer, Copyright § 4.06 p. 4034 n.1). Here, the Complaint essentially alleges a claim based on copyrights of her routines, which are entirely different than the copyrights Plaintiff claimed in the registrations of the sound recordings of her routines. Plaintiff's

copyright claim is akin to conflating a copyright in the Cole Porter song with a copyright in Sinatra's performance of the song.

Because Plaintiff has failed to register her purported copyright interests in the underlying comedy routines, Plaintiff has failed to comply with Section 411 of the Copyright Act. Plaintiff's claims of infringement are barred.

## III. PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM SHOULD BE DISMISSED BECAUSE UPROAR HAD THE CLEAR RIGHT TO USE THE UNDERLYING COMEDY ROUTINES.

Even if Plaintiff had properly claimed and registered a copyright interest in the subject comedy routines performances, Plaintiff's claim of copyright infringement must fail because the terms of the Recording Agreement expressly and implicitly give Uproar the right to use the comedy routines as embodied in the Master Sound Recordings.

### A. Because The Sounds Recording Are Derivative Works Of The Comedy Routines, Uproar Had An Implied License to Use the Comedy Routines.

The Master Sound Recordings are derivative works of the comedy routines, and Uproar could only have a right to use and license the derivative works with Plaintiff's permission—without such permission, Uproar could not use the Master Sound Recordings as established in the Recording Agreement. Therefore, Uproar had an implied license to use the comedy routine as embodied in the sound recordings.

The Copyright Act defines a derivative work as "a work based upon one or more preexisting works[.]" 17 U.S.C. § 101. The Act provides examples of a derivative works, including the example of a "sound recording." *Id.*; *see also* 2 M. Nimmer, Nimmer on Copyright § 2.10[A] n.8 (2022) ("A sound recording is a derivative work in relation to the musical work recorded therein, just as a motion picture is a derivative work in relation to the novel or screenplay upon which it is based."). "A work can generally be

copyrighted as a derivative work *only if the new work was produced with the permission of the copyright owner* of the preexisting work or its duly authorized licensee." *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197 (10th Cir. 2005) (emphasis added); *see Bridgeport Music, Inc. v. Dimension Films*, 383 F.3d 390, 398 n. 7 (6th Cir.2004) ( "Needless to say, in the case of a [sound] recording of a musical composition the imitator would have to clear with the holder of the composition copyright.").[2] "Under federal law, a nonexclusive license [to a copyright] may be granted orally, or may even be implied from conduct." 3. M. Nimmer & D. Nimmer, Nimmer on Copyright § 10.03[A].

There is no dispute that Uproar had a right to use and license the Master Sound Recordings. *See* Dkt. 13, FAC, Ex. B, ¶ 2 ("It is understood that this Agreement is for the exclusive rights to reproduce, distribute the Master Sound Recordings throughout the world[.]"). This explicit right to use the sound recording included the implied right to use and license the comedy routine as embodied in the sound recording. Indeed, courts have recognized that the legal right to use and license a sound recording includes the implied license to use the composition underlying the sound recording. *See Pamfiloff v.*

[2] This brief utilizes the interaction between copyright interests in sound recordings and underlying musical works in order to illustrate the distinctions and relations between interests embodied in a single recording. However, musical works (or "compositions") are materially distinct from comedy routines in a number of ways. While musical works often incorporate lyrics, melody, chord progressions, successions of pitches and rhythm, comedy routines are more akin to literary works. Also, musical works are commonly performed and recorded by more than one artist, and have a long history under the Copyright Act of being licensed and administered separate from sound recordings embodying the work. Comedy routines, conversely, are generally not recorded by anyone but the original author/performer, and are not commonly licensed apart from a recording embodying the work. As such, notwithstanding the comparisons to musical works herein, Uproar reserves the right to further clarify the treatment of Plaintiff's claimed rights to the comedy routines embodied in the Master Sound Recordings as distinct from rights to a musical work.

*Giant Recs., Inc.*, 794 F. Supp. 933, 938 (N.D. Cal. 1992) ("This court agrees with Plaintiffs' assertion that the Recording Agreement must be interpreted to contain an implied nonexclusive license to use the musical composition[.]"); *accord Lulirama, Ltd. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872 (5th Cir.1997) (finding implied non-exclusive license where the plaintiff created an advertising jingle for the defendant to sell to other parties); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749 (11th Cir.1997) (finding implied non-exclusive license where a composer created a song at the request of the defendant and with the intention that the defendant would play song at event).

Because Uproar had the right to use and license the Master Sound Recordings, Uproar necessarily had the right to use and license the comedy routines that were embodied in the Master Sound Recordings.

**B. The Recording Agreement Expressly Permits Uproar to Use the Comedy Performances.**

The Recording Agreement expressly gives Uproar the right to use and license the Master Sound Recordings, which include the comedy routines embodied therein, without paying any additional compensation for the comedy routines. In the music industry, the custom is for a music artist to authorize a record company to use the artist's underlying musical works as embodied in a particular sound recording. Absent the right to use the artist's embodied musical work, the record company would not have the right to use the sound recording that embodies the musical work. Music recording agreements account for the underlying musical work in one of two ways. Commonly, the recording agreement could entitle the music artist to receive a "mechanical royalty" for the use of the musical work and a record royalty for the use of the sound recording of the musical work. *Cf. Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 776 (2d Cir. 1992) ("The royalties earned from the manufacture and sale of records of the [musical works] (known as 'mechanical royalties') were split evenly . . . , as were royalties from licenses for use

of the songs in broadcasts and movies."). Other times, the recording agreement provides only a record royalty, which is payment for both the musical work and the sound recording.

Here, the Recording Agreement gives Uproar the "exclusive rights to reproduce and distribute the Master Sound Recordings throughout the world in any sound recording form now known or unknown," including by licensing the Master Sound Recordings to third parties. Dkt. 13, FAC, Ex. B, ¶¶ 2, 4(c). The Recording Agreement then provides that Uproar owes Plaintiff record royalties in connection with distribution of the albums, *Id.*, Ex. B, ¶ 4, and explicitly says that "[t]here are no mechanical royalties due and payable." *Id.*, Ex. B, ¶ 11. Thus, the Recording Agreement makes clear that Uproar, in exchange for paying only recording royalties, has the right to use and license both the Master Sound Recordings and the comedy routines embodied therein. *Id.*, Ex. B ¶ 4(a).

* * *

In the end, if the Recording Agreement did not grant—either explicitly or implicitly—the right to use and license the comedy routines embodied in the Mater Sound Recordings, then Uproar would have no right to use and license the Master Sound Recordings themselves. Plaintiff's position eviscerates the Recording Agreement itself, as Plaintiff would have given *zero consideration* to Uproar in exchange for the record royalties to which she is entitled (and that she has collected for decades). *See, e.g.*, *Kremen v. Cohen*, 337 F.3d 1024, 1028 (9th Cir.2003) (Consideration "must be something of real value." (quotation marks omitted)). Thankfully, that is not the case because Uproar, in exchange for paying the record royalties, has the right—either implicitly or explicitly—to use and license the Master Sound Recordings *and the comedy routines embodied therein*.

## IV. PLAINTIFF'S BREACH OF CONTRACT AND ACCOUNTING CLAIMS SHOULD BE DISMISSED BECAUSE THEY ARE DEPENDENT ON PLAINTIFF'S DEFUNCT COPYRIGHT THEORY.

Plaintiff's remaining claims are dependent upon her fatally flawed copyright infringement claim, and must therefore be dismissed.

### A. Breach of Contract Claim

Plaintiff's breach of contract claim is based almost entirely upon the claims underlying Plaintiff's copyright infringement claims, and must fail for the same reasons provided above. Plaintiff alleges Uproar breached the Recording Agreement by entering into license agreements with various third parties, in violation of Plaintiff's claimed copyright in comedy routines underlying the Musical Sound Recordings. Dkt. 13, FAC ¶¶ 33-38. Because Uproar has a license to use the underlying comedy routines as embodied in the recordings, there is no breach of the Recording Agreement.

Plaintiff additionally claims Uproar breached the agreement by not paying Plaintiff all monies due pursuant to the Recording Agreement, *id.* ¶ 39, though this claim is refuted by the undisputed terms of the Recording Agreement itself. Plaintiff claims Uproar has paid her only $110.24 since December 26, 1997, but the Recording Agreement shows that Plaintiff received a $1,000 advance against royalties for the first album recorded, *id.*, Ex. B ¶ 4(a), and the Addendum to the Recording Agreement shows Plaintiff received 100 CDs in lieu of an advance in or around June 2003 (approximately a $1,200 value) in payment for the second album recorded. *Id.*, Ex. C. The Amended Complaint does not allege, nor can it, that Uproar failed to pay Plaintiff in accordance with these terms. As such, this final allegation is false on its face and Plaintiff's breach of contract claim should be dismissed.

**B. Accounting Claim**

Similarly, Plaintiff's accounting claim is based on the failed infringement claim, and should therefore be dismissed. Moreover, the Recording Agreement provides a mechanism whereby Plaintiff may appoint a CPA or attorney to examine Uproar's books and records. *Id.* Ex. B ¶ 5. As such, a court-ordered accounting would be unnecessary and inappropriate.

**CONCLUSION**

Plaintiff's claims should be dismissed pursuant to Rule 12(b)(6). Uproar did not infringe any rights held by Plaintiff because Uproar had a license to use the comedy routines underlying the Master Sound Recordings, and each of Plaintiff's claims are based on this flawed theory of infringement. For these reasons, the FAC should be dismissed with prejudice and Uproar should be awarded its costs and attorneys' fees pursuant to 17 U.S.C. § 505.

Respectfully submitted, this the 10th day of November, 2022.

**CYLG, P.C.**

*/s/ R. Anthony Young**
R. Anthony Young

Attorneys for Defendant
UPROAR ENTERTAINMENT

**PROOF OF SERVICE**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

I am a citizen of the United States, over 18 years of age and am not a party to the within action. My business address is 1901 Avenue of the Stars, Suite 200, Los Angeles, CA 90067 and I hereby certify that on this 10th day of November, 2022, I electronically filed the forgoing **DEFENDANT UPROAR ENTERTAINMENT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT (Fed.R.Civ.Proc. 12(b)(6)); MEMORANDUM OF POINTS AND AUTHORITIES** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 10, 2022, at Raleigh, North Carolina.

*/s/ R. Anthony Young*
R. Anthony Young